Nebraska Supreme Court Online Library
www.nebraska.gov/apps-courts-epub/
04/23/2020 10:11 AM CDT

Ann Coyle White, appellee and cross-appellant,
v. Timothy Vincent White, appellant
and cross-appellee.

___ N.W.2d ___

Filed January 31, 2020.    No. S-19-047.

1. **Divorce: Child Custody: Child Support: Property Division: Alimony: Attorney Fees: Appeal and Error.** In a marital dissolution action, an appellate court reviews the case de novo on the record to determine whether there has been an abuse of discretion by the trial judge. This standard of review applies to the trial court's determinations regarding custody, child support, division of property, alimony, and attorney fees.
2. **Evidence: Appeal and Error.** In a review de novo on the record, an appellate court is required to make independent factual determinations based upon the record, and the court reaches its own independent conclusions with respect to the matters at issue.
3. **Judges: Words and Phrases.** A judicial abuse of discretion exists if the reasons or rulings of a trial judge are clearly untenable, unfairly depriving a litigant of a substantial right and denying just results in matters submitted for disposition.
4. **Divorce: Property Division.** Under Neb. Rev. Stat. § 42-365 (Reissue 2016), the equitable division of property is a three-step process.
5. ____: ____. The first step in the equitable division of property is to classify the parties' property as marital or nonmarital, setting aside the nonmarital property to the party who brought that property to the marriage.
6. ____: ____. All property accumulated and acquired by either spouse during the marriage is part of the marital estate, unless it falls within an exception to this general rule.
7. ____: ____. The marital estate does not include property that a spouse acquired before the marriage, or by gift or inheritance.
8. ____: ____. Any given property can constitute a mixture of marital and nonmarital interests; a portion of an asset can be marital property while another portion can be separate property.

9. \_\_\_\_: \_\_\_\_. The original capital or value of an asset may be nonmarital, while all or some portion of the earnings or appreciation of that asset may be marital.

10. **Divorce: Property Division: Presumptions.** Accrued investment earnings or appreciation of nonmarital assets during the marriage are presumed marital unless the party seeking the classification of the growth as nonmarital proves: (1) The growth is readily identifiable and traceable to the nonmarital portion of the account and (2) the growth is not due to the active efforts of either spouse.

11. **Divorce: Property Division: Words and Phrases.** Appreciation caused by marital contributions is known as active appreciation, and it constitutes marital property.

12. \_\_\_\_: \_\_\_\_: \_\_\_\_. Passive appreciation is appreciation caused by separate contributions and nonmarital forces.

13. **Divorce: Property Division: Proof.** The burden is on the owning spouse to prove the extent to which marital contributions did not cause the appreciation or income.

14. **Evidence: Appeal and Error.** When evidence is in conflict, the appellate court considers and may give weight to the fact that the trial court heard and observed the witnesses and accepted one version of the facts rather than another.

15. **Divorce: Property Division.** Separate property becomes marital property by commingling if it is inextricably mixed with marital property or with the separate property of the other spouse.

16. \_\_\_\_: \_\_\_\_. If the separate property remains segregated or is traceable into its product, commingling does not occur.

17. \_\_\_\_: \_\_\_\_. The second step in the equitable division of property is to value the marital assets and marital liabilities of the parties.

18. **Divorce: Property Division: Appeal and Error.** As a general principle, the date upon which a marital estate is valued should be rationally related to the property composing the marital estate.

19. **Divorce: Property Division.** The third step in the equitable division of property is to calculate and divide the net marital estate between the parties in accordance with the principles contained in Neb. Rev. Stat. § 42-365 (Reissue 2016).

20. \_\_\_\_: \_\_\_\_. The ultimate test in determining the appropriateness of the division of property is fairness and reasonableness as determined by the facts of each case.

Appeal from the District Court for Douglas County: Leigh Ann Retelsdorf, Judge. Affirmed as modified.

Anthony W. Liakos and, on brief, Pamela Hogenson Govier, of Govier, Katskee, Suing & Maxell, P.C., L.L.O., for appellant.

Paul M. Shotkoski and Michael F. Coyle, of Fraser Stryker, P.C., L.L.O., for appellee.

Miller-Lerman, Cassel, Stacy, Funke, Papik, and Freudenberg, JJ.

Cassel, J.

## I. INTRODUCTION

Timothy Vincent White (Tim) appeals from a decree dissolving his marriage to Ann Coyle White. Ann cross-appeals. The main issue is whether the growth in value of one investment account, derived from a nonmarital source, was properly classified as marital property. Under the active appreciation rule, Tim had the burden to prove that the growth was not due to the active efforts of either spouse. Under the specific facts here, he failed to do so. But he established that part of another investment account was nonmarital, and we modify the decree accordingly. Upon de novo review, we find no abuse of discretion regarding the court's valuation date, division of a tax liability, and order for an equalization payment. As so modified, we affirm the decree.

## II. BACKGROUND

Ann and Tim were married in September 1990. In May 2017, Ann filed a dissolution action. There were no minor children, alimony was not contested, and the parties mostly agreed to the division of property. On appeal, the parties dispute only the marital or nonmarital characterization of two investment accounts: the Waddell & Reed 6300 account (6300 account) and the Charles Schwab account (Schwab account), the valuation date for the two accounts, the allocation of the 2017 tax liability, and the amount of the equalization payment. We begin with the accounts.

### 1. Inheritance and Gifts

In 2008, Tim's mother died. As an inheritance, he received 4,900 shares of ConAgra stock and $100,000. In April 2012, he used the $100,000 to purchase mutual funds and transferred the funds to open the 6300 account. He then used the 4,900 shares of ConAgra stock to open the Schwab account. From that point on, the accounts differed.

### (a) 6300 Account

Regarding the 6300 account, Tim never made any deposits or withdrawals from the account. The account was solely in Tim's name. Ann was aware of the account but unaware that it was in his name. Tim testified that he told Ann he would take the $100,000 and diversify it into mutual funds. Because Tim is a licensed financial advisor, he allocated the investments using "modern portfolio theory"—which he used for all his clients. Each year, he reinvested any income earned on the account. Tim presented evidence that the balance of the 6300 account as of June 30, 2017, was $338,852. Tim's valuation date represented the parties' separation date. Ann presented evidence that the balance of the 6300 account as of July 31, 2018—a date close to trial—was $357,213.

In the district court's decree, it found that June 30, 2017, was the valuation date for the marital estate "as that date is best supported by the evidence and represents the separation of the parties['] working finances."

Further, the court recognized that the account was created with Tim's inherited funds and was opened solely in his name. The taxable income derived from the account, the court noted, was reported on the parties' joint tax returns. It found that the parties discussed the management of the account—specifically, the diversification of the money into four mutual funds. The court reasoned that Tim made a marital contribution to the appreciation, because "there clearly [was] a causal connection between [Tim's] investment strategy and the growth in value." It awarded the initial $100,000 investment as a nonmarital

asset to Tim. It then classified the appreciation as a marital asset and awarded it to Tim.

(b) Schwab Account

Tim opened the Schwab account with the 4,900 shares of ConAgra stock. After this account was opened, Tim's father gave 38,000 shares of ConAgra stock to Tim by two direct transfers into the account. Throughout the parties' marriage, they had received gifts of ConAgra stock. All previous gifts were deposited into the parties' joint account. Tim testified that "I was going to keep it separate from our joint account, which was a margin account, because we had blown through all of those assets on margin living beyond our means."

Tim managed all withdrawals and deposits from the Schwab account. In 2013, Tim transferred funds from the Schwab account to purchase a new marital home. About $240,000 of marital funds were transferred from the joint account to the Schwab account. Tim diversified the Schwab account and sold shares of ConAgra to purchase shares in four other companies. He then purchased several units of exchange trade funds (ETF's) with proceeds from ConAgra stock and marital moneys in the account. Throughout the marriage, Tim withdrew money from the Schwab account for household expenses, trips, major repairs, and remodeling the marital home. Neither party deposited any income into the Schwab account.

Tim presented evidence that the value of the Schwab account on June 30, 2017, was $1,432,796. According to evidence Ann submitted, the value of the Schwab account on July 31, 2018, was $1,648,705.

In the district court's decree, it reasoned that no evidence, other than opening the account in his name, supported an intent to treat the Schwab account differently from previously gifted assets. After reviewing the evidence regarding the Schwab account, the district court reasoned that the difference in the purpose, management, and utilization of the Schwab account, in contrast to the 6300 account, resulted in the entire account being a marital asset. The court stated:

[T]he totality of evidence before the Court makes it clear that both parties intended the [Schwab account] as a "nest egg" for the parties' future and the entirety of the account should be treated as a marital asset, as valued on June 30, 2017, at $1,432,796. This amount is ordered to be equally divided between the parties.

## 2. Tax Liability and Equalization Payment

At trial, Tim testified that the parties always had filed a joint tax return. He agreed that in practice, if the withholdings from Ann's salary did not satisfy the entire tax obligation, the balance would be paid from the Schwab account. The district court determined that because the valuation date of the Schwab account and the 6300 account was June 30, 2017, Tim would be required to pay the 2017 tax liability.

The district court found that the marital estate should be divided equally. Pursuant to the parties' stipulations and the court's division of the disputed accounts, it ordered Tim to pay Ann $14,373 to equalize the division.

Tim filed a timely appeal, and Ann cross-appealed. We moved the proceeding to our docket.[1]

## III. ASSIGNMENTS OF ERROR

On appeal, Tim assigns that the district court erred in (1) finding that the appreciation in the 6300 account constituted marital property, (2) finding that the Schwab account was marital property, (3) ordering him to pay the entirety of the parties' 2017 joint tax liability, and (4) ordering him to pay an equalization amount.

Ann cross-appeals and assigns that the district court erred in valuing the accounts on June 30, 2017, rather than July 31, 2018.

---

[1] See Neb. Rev. Stat. § 24-1106(3) (Cum. Supp. 2018).

## IV. STANDARD OF REVIEW

[1] In a marital dissolution action, an appellate court reviews the case de novo on the record to determine whether there has been an abuse of discretion by the trial judge. This standard of review applies to the trial court's determinations regarding custody, child support, division of property, alimony, and attorney fees.[2]

[2] In a review de novo on the record, an appellate court is required to make independent factual determinations based upon the record, and the court reaches its own independent conclusions with respect to the matters at issue.[3]

[3] A judicial abuse of discretion exists if the reasons or rulings of a trial judge are clearly untenable, unfairly depriving a litigant of a substantial right and denying just results in matters submitted for disposition.[4]

## V. ANALYSIS

[4] It is well settled that under Neb. Rev. Stat. § 42-365 (Reissue 2016), the equitable division of property is a three-step process.[5] Because the parties' assignments of error attack different steps in the process, we take up each assignment as it fits into the three-step framework.

### 1. Classification

[5] The first step in the equitable division of property is to classify the parties' property as marital or nonmarital, setting aside the nonmarital property to the party who brought that property to the marriage.[6] Tim makes two arguments regarding the court's classification decisions. First, he argues that the appreciation in the 6300 account was nonmarital, because

---

[2] *Burgardt v. Burgardt, ante* p. 356, 934 N.W.2d 488 (2019).

[3] *Id.*

[4] *Id.*

[5] See *Dooling v. Dooling*, 303 Neb. 494, 930 N.W.2d 481 (2019).

[6] See *id.*

it was the direct fruit of his inheritance. Second, he argues that the court erred in classifying the entirety of the Schwab account as marital property, because, he contends, the growth of the account was readily identifiable and traceable to the nonmarital property. We address each argument in turn.

### (a) 6300 Account

Tim argues that the appreciation on the 6300 account could not be considered marital property, because he did not actively manage the account. His testimony showed, he contends, that after selecting the initial mutual funds, he relied on professional money managers to manage the funds. He contends that the district court's reliance on *Stephens v. Stephens*[7] was misplaced, because the instant case involves classification of an inheritance and not a business interest. Additionally, he contends that our broad definition of active appreciation in *Stephens*, if extended to the 6300 account, would make it "virtually impossible . . . to retain the non-marital nature of a particular asset" where the inheriting spouse has "merely made the decision to invest in funds that happen to grow over time."[8]

[6-9] All property accumulated and acquired by either spouse during the marriage is part of the marital estate, unless it falls within an exception to this general rule.[9] The marital estate does not include property that a spouse acquired before the marriage, or by gift or inheritance.[10] Any given property can constitute a mixture of marital and nonmarital interests; a portion of an asset can be marital property while another portion can be separate property.[11] "Therefore, the original capital or value of an asset may be nonmarital, while all or

---

[7] *Stephens v. Stephens*, 297 Neb. 188, 899 N.W.2d 582 (2017).

[8] Brief for appellant at 18.

[9] *Stephens v. Stephens, supra* note 7.

[10] *Brozek v. Brozek*, 292 Neb. 681, 874 N.W.2d 17 (2016).

[11] *Stephens v. Stephens, supra* note 7.

some portion of the earnings or appreciation of that asset may be marital."[12]

Here, the focus is only on the growth of the 6300 account. The district court allocated the original investment of $100,000 solely to Tim as nonmarital.

[10-13] The active appreciation rule sets forth the relevant test to determine to what extent marital efforts caused any part of an asset's appreciation or income.[13] Accrued investment earnings or appreciation of nonmarital assets during the marriage are presumed marital unless the party seeking the classification of the growth as nonmarital proves: (1) The growth is readily identifiable and traceable to the nonmarital portion of the account and (2) the growth is not due to the active efforts of either spouse.[14] Appreciation caused by marital contributions is known as active appreciation, and it constitutes marital property.[15] Passive appreciation is appreciation caused by separate contributions and nonmarital forces.[16] The burden is on the owning spouse to prove the extent to which marital contributions did not cause the appreciation or income.[17]

As an initial matter, Tim contends that the active appreciation rule in *Stephens* did not apply here, because the rule addressed appreciation on a nonmarital business interest rather than an inheritance.[18] We disagree. In *Stephens*, we held that "the principles set forth in [*Stanosheck v. Jeanette*[19]] apply equally to appreciation or income during the marriage of

---

[12] *Id*. at 201, 899 N.W.2d at 592.

[13] See *Stephens v. Stephens, supra* note 7.

[14] *Id.*

[15] *Id.*

[16] *Id.*

[17] *Id.*

[18] See *id.*

[19] *Stanosheck v. Jeanette*, 294 Neb. 138, 881 N.W.2d 599 (2016).

*any nonmarital asset*."[20] We did not limit our holding solely
to retirement accounts and business interests, and we decline
to do so now. Therefore, the burden was on Tim to rebut
the presumption that the appreciation in the 6300 account
was marital.

Tim satisfied the first test of the active appreciation rule.
Neither party disputes that the growth in the 6300 account was
readily identifiable and traceable to the nonmarital portion of
the account. Accordingly, the issue before us is the rule's sec-
ond prong: whether the growth in the 6300 account was due to
the active efforts of either spouse.

Tim contends that the definition of active appreciation in
*Stephens* and our application of the active appreciation rule
is too broad.[21] As we quoted above, he contends that the rule
imposes an "impossible" burden on an inheriting spouse to
maintain an asset's nonmarital character. In making this argu-
ment, he relies on academic criticism of *Stephens*, which, he
argues, illustrates that our broad definition of active apprecia-
tion encapsulates passive market conditions. Referring to our
decision, the writer commented:

> In particular, [*Stephens*] held that "[e]ven favorable mar-
> ket conditions are not passive inasmuch as they create
> merely the opportunity that the skilled, owning spouse
> detects and seizes." . . . The court cited for this point [to]
> § 5:57 of the third edition of this treatise. But § 5:57 did
> not say that all appreciation caused by favorable market
> conditions is active. On the contrary, it stated expressly
> that appreciation caused by market conditions is gener-
> ally passive.[22]

We will address Tim's argument in two parts. First, we will
discuss case law concerning the development of the active

---

[20] *Stephens v. Stephens, supra* note 7, 297 Neb. at 205, 899 N.W.2d at 595
(emphasis supplied).

[21] See *Stephens v. Stephens, supra* note 7.

[22] 3 Brett R. Turner, Equitable Distribution of Property, § 10:29.2 at 408 (4th
ed. 2019).

appreciation rule in Nebraska and its application in other states. Then, we will apply the active appreciation rule to the facts of this case.

### (i) Case Law on Active Appreciation

We first discussed the concept of active appreciation in *Coufal v. Coufal*.[23] In *Coufal*, we discussed whether the appreciation on the husband's nonmarital contributions to his state retirement account was marital property. We began by examining to what extent the appreciation in the nonmarital portion of the account was caused by the efforts of either spouse. We relied on *Van Newkirk v. Van Newkirk*[24] and *Buche v. Buche*[25] for the reasoning that "some level of indirect or direct effort was required by the nontitled spouse—not just inflation or market forces—in order to include the increase in value in the marital estate."[26]

In *Coufal*, we then analogized the account to a certificate of deposit with a fixed rate of interest that was owned by a spouse prior to the marriage. We explained that both the principal and the interest remained separate property, because it was acquired before the marriage and no marital effort or contribution affected the accrual of interest. We reasoned that because the interest accrued solely from the operation of Neb. Rev. Stat. § 84-1301 (Cum. Supp. 2018), no effort of either spouse directly or indirectly affected the appreciation. We rejected the wife's argument that the marital and nonmarital portions of the account were commingled. We reasoned that the appreciation on the nonmarital portion of the account was readily identifiable and traceable. Thus, we concluded, the appreciation of the nonmarital portion of the husband's state retirement account was also nonmarital.

---

[23] *Coufal v. Coufal*, 291 Neb. 378, 866 N.W.2d 74 (2015).

[24] *Van Newkirk v. Van Newkirk*, 212 Neb. 730, 325 N.W.2d 832 (1982), *abrogated, Stephens v. Stephens, supra* note 7.

[25] *Buche v. Buche*, 228 Neb. 624, 423 N.W.2d 488 (1988).

[26] *Coufal v. Coufal, supra* note 23, 291 Neb. at 384, 866 N.W.2d at 78.

In *Stanosheck v. Jeanette*,[27] we discussed the application of *Coufal* to nonmarital retirement accounts. We agreed that *Coufal* was not restricted to any particular kind of retirement account; instead, its applicability was dependent on the facts of each case. Extrapolating a test from *Coufal*, we stated that investment earnings accrued during the marriage on the non-marital portion of a retirement account may be classified as nonmarital where the party seeking the classification proves: (1) The growth is readily identifiable and traceable to the non-marital portion of the account and (2) the growth is due solely to inflation, market forces, or guaranteed rate rather than the direct or indirect effort, contribution, or fund management of either spouse.[28]

In *Stephens*, we discussed the concept of active appreciation regarding a business interest.[29] We rejected the husband's argument that *Coufal* and *Stanosheck* apply only to appreciation on retirement accounts. After reexamining *Van Newkirk* and our case law on awards under *Grace v. Grace*,[30] we found them inapplicable in our modern dual classification system but did not absolutely forbid a court from taking into account nonmarital assets in its equitable division of the marital estate.[31]

Then, relying on *Stanosheck*, we articulated in *Stephens* the active appreciation rule. In doing so, we agreed with several other jurisdictions that the burden is on the owning spouse to prove the extent to which marital contributions did not cause the appreciation and expressly held that the appreciation or income of a nonmarital asset during the marriage is marital

---

[27] *Stanosheck v. Jeanette, supra* note 19.

[28] *Id.*

[29] *Stephens v. Stephens, supra* note 7.

[30] See *Grace v. Grace*, 221 Neb. 695, 380 N.W.2d 280 (1986), *abrogated, Stephens v. Stephens, supra* note 7.

[31] *Stephens v. Stephens, supra* note 7.

insofar as it was caused by the efforts of either spouse or both spouses.[32]

Applying the active appreciation rule in *Stephens*, we reasoned that the district court should not have excluded the business interest from the marital estate. We explained that the growth in the value of the husband's business interest depended on the extent of growth of the business that was caused by his active efforts. We discussed the husband's active efforts as someone in first-tier management. The husband was a cofounder of the business and worked full time for 25 years, contributing significantly to the business' growth.

We then discussed in *Stephens* the direct and indirect efforts of a spouse. We rejected the argument that "'"ground work"'" for growth was laid before the marriage and would preclude appreciation of the company's value during the marriage as marital.[33] We illustrated a spouse's indirect efforts as active efforts when his or her mere presence was identified with the business entity and tied to its goodwill.

Regarding direct efforts, we cited to Turner's treatise on equitable distribution. "'[E]ven favorable market conditions are not passive inasmuch as they create merely the opportunity that the skilled, owning spouse detects and seizes.'"[34] In the context of *Stephens*, the quotation merely explained how a business owner could actively exploit favorable market conditions. We reject the interpretation that favorable market conditions necessarily result in active appreciation. We reasoned that the husband did not carry his burden to demonstrate that any portion of his business' appreciation was due to passive efforts or "the active efforts of third parties who would qualify as first-tier management or similar."[35] In light of the burden of proof, the record presented evidence that the husband's active efforts

---

[32] *Id.*

[33] *Id.* at 208, 899 N.W.2d at 596.

[34] 3 Turner, *supra* note 22.

[35] *Stephens v. Stephens, supra* note 7, 297 Neb. at 208, 899 N.W.2d at 596.

were responsible for at least 34 percent of the business' growth during the marriage.

In *Baker v. Baker*,[36] the Minnesota Supreme Court discussed active appreciation on the nonmarital portion of the husband's retirement account. The husband had 11 separate accounts, which were moved between several financial institutions, including Merrill Lynch. The Merrill Lynch manager of the husband's account testified that he and his money managers had discretion to invest the money from the accounts. The Merrill Lynch manager had power to direct investment and transfer funds between investment institutions. The husband directed only one trade to be made in 13 years at Merrill Lynch. He never made a withdrawal or received distributions from the accounts during the marriage. All investment returns were reinvested. The Minnesota Court of Appeals reasoned that because the husband had control over the accounts by transferring them between institutions, he actively managed the accounts and defeated the claim that the investment was passive.

In disagreeing with the lower court's analysis, the Minnesota Supreme Court in *Baker* made five points. Its precedent on active appreciation focused on the spouse's efforts and not the spouse's control over an asset. Its case law regarding active appreciation dealt primarily with appreciation in the value of a small business or real estate. In evaluating an investment portfolio, the court looked to the character of the underlying investments. And it rejected the lower court's reliance on agency principles to attribute Merrill Lynch's efforts to the husband. Instead, the Minnesota Supreme Court reasoned that by utilizing professional investment institutions, the husband avoided the need to devote significant marital efforts to managing his retirement funds. Thus, the court concluded, the husband's efforts were insufficient to render the appreciation active.

---

[36] *Baker v. Baker*, 753 N.W.2d 644 (Minn. 2008).

In *Chapman v. Chapman*,[37] the Florida District Court of
Appeal discussed active appreciation on bonds in a retirement
account. The issue before the court was whether the trial court
erred in holding that a portion of increase of nonmarital securi-
ties resulted from marital labor. The husband's efforts were lim-
ited to replacing investment grade bonds, as they became due,
with similar bonds. The wife's expert opined that the husband's
active trading of stocks and bonds enabled him to achieve a
greater annual return than the benchmark for stocks and bonds.
The wife presented evidence of "the benchmark [of return] for
stocks [through] the Standard & Poors 500 Stock Index" and
"[t]he benchmark for . . . bonds [through] the Lehman Brothers
Aggregate Bond Index . . . ."[38] The appellate court affirmed the
trial court's treatment of the portion of the appreciation which
could have been achieved through passive investment as non-
marital and the additional appreciation as marital.

In *O'Brien v. O'Brien*,[39] the North Carolina Court of Appeals
discussed appreciation in an investment account funded with
inherited moneys. After setting forth the evidence which per-
suaded the court that the original nonmarital investments
were traced to the existing account, the court then discussed
whether the appreciation should be considered marital. It
adopted a multifactorial approach from the Missouri Court of
Appeals to determine whether either spouse performed sub-
stantial services during the marriage to increase the value of
the investment.

> In making the determination of whether the services of
> a spouse are substantial, the trial court should consider,
> among other relevant facts and circumstances of the par-
> ticular case, the following factors: (1) the nature of the
> investment; (2) the extent to which the investment deci-
> sions are made *only* by the party or parties, made by

---

[37] *Chapman v. Chapman*, 866 So. 2d 118 (Fla. App. 2004).

[38] *Id.* at 118-19.

[39] *O'Brien v. O'Brien*, 131 N.C. App. 411, 508 S.E.2d 300 (1998).

the party or parties in consultation with their investment broker, or solely made by the investment broker; (3) the frequency of contact between the investment broker and the parties; (4) whether the parties routinely made investment decisions in accordance with the recommendation of the investment broker, and the frequency with which the spouses made investment decisions contrary to the advice of the investment broker; (5) whether the spouses conducted their own research and regularly monitored the investments in their accounts, or whether they primarily relied on information supplied by the investment broker; and (6) whether the decisions or other activities, if any, made solely by the parties directly contributed to the increased value of the investment account.[40]

The North Carolina appellate court agreed with the trial court that because the spouses jointly met with the broker and routinely chose between the broker's alternative recommendations, neither spouse's services were substantial.

We adhere to the active appreciation rule articulated in *Stephens*. Tim had the burden to prove that all or some portion of the growth in value was not attributable to his or Ann's active efforts. We reject his assertion that this imposed an "impossible" burden. And we agree that in an appropriate case and depending upon the particular circumstances, the factors articulated by the North Carolina appellate court may be useful in assessing whether growth was attributable to the efforts of either spouse.

### (ii) Application

[14] Upon a de novo review of the record for an abuse of the district court's discretion, we conclude that Tim failed to carry his burden. And here, witness credibility becomes important. When evidence is in conflict, the appellate court considers and may give weight to the fact that the trial court heard and

---

[40] *Id*. at 421, 508 S.E.2d at 307.

observed the witnesses and accepted one version of the facts rather than another.[41]

We concede that there was no evidence of any active efforts on Ann's part; thus, we look solely to Tim's efforts. At oral argument, neither party disputed that the growth amounted to something in the neighborhood of *15 percent compounded annually*. In other words, both acknowledged what appeared to be a highly successful rate of growth.

Tim presented no evidence to establish that this growth was attributable solely to passive market forces or separate contributions, even in part. Tim did not present evidence of some recognized benchmark of general market growth, which might have been very persuasive evidence of the effect of market forces.[42] Nor did he present evidence that the annual rate of return, or some portion of it, was guaranteed or statutorily prescribed.[43] He failed to show that he relied on the recommendations or management of his account by a third party.[44] To the contrary, in light of the district court's findings, the evidence showed that through Tim's direct efforts of employing his modern portfolio theory, he achieved a highly successful return on his investment. He did not distinguish these efforts from similar efforts he provided to his clients. Without evidence showing that his direct or indirect efforts did not cause the appreciation, we agree with the district court that there was a causal connection between Tim's efforts in employing his modern portfolio theory and the appreciation on the account.

Had the evidence provided a basis for distinguishing the results attributable to his efforts from the results that would have occurred merely because of market forces, the district

---

[41] *Burgardt v. Burgardt, supra* note 2.

[42] See *Chapman v. Chapman, supra* note 37.

[43] See, *Coufal v. Coufal, supra* note 23; *Stanosheck v. Jeanette, supra* note 19.

[44] See *Stephens v. Stephens, supra* note 7. See, also, *Baker v. Baker, supra* note 36; *O'Brien v. O'Brien, supra* note 39.

court might have abused its discretion in failing to treat some or all of the appreciation as nonmarital. But, here, Tim had the burden of proof and he simply failed to carry that burden. Accordingly, the district court did not err in classifying the appreciation on the 6300 account as marital.

(b) Schwab Account

Tim argues that the entirety of the Schwab account is nonmarital, because the growth was readily identifiable and traceable to the inherited and gifted assets. Tim contends that the record showed that he never had the intent to make the gifted or inherited assets marital property, because he opened the account solely in his name and the growth in the account was not due to his active efforts. He contends that the district court placed extensive emphasis on its interpretation of Tim's intent and erroneously considered Ann's intent regarding the account.

As stated earlier in this opinion, the marital estate does not include property that a spouse acquired before the marriage, or by gift or inheritance.[45] The burden of proof rests with the party claiming that property is nonmarital.[46]

The record shows that Tim inherited shares of ConAgra stock from his late mother and received gifts of additional shares of ConAgra stock from his father and his uncle. All stock was placed in the Schwab account, along with other marital property. Although the vast majority of the ConAgra stock was converted into other assets, at the valuation date, 6,500 shares of ConAgra stock remained.

[15,16] Setting aside nonmarital property is simple if the spouse possesses the original asset, but can be problematic if the original asset no longer exists.[47] Separate property becomes marital property by commingling if it is inextricably mixed with marital property or with the separate property of the other

---

[45] *Stephens v. Stephens, supra* note 7.

[46] *Rohde v. Rohde*, 303 Neb. 85, 927 N.W.2d 37 (2019).

[47] *Brozek v. Brozek, supra* note 10.

spouse.[48] If the separate property remains segregated or is traceable into its product, commingling does not occur.[49]

### (i) Remaining ConAgra Stock

Tim showed that the ConAgra stock left in the Schwab account remained segregated and traceable. The evidence is undisputed that all of the shares of ConAgra stock that came into the Schwab account were Tim's by inheritance or gift. Although most of the stock was sold, there were 6,500 shares remaining at the time of trial. We conclude that Tim met his burden of tracing the remaining shares of ConAgra stock and proving it to be nonmarital. Therefore, the district court erred in classifying the 6,500 shares of ConAgra stock as marital property. We modify the court's decree to determine that the remaining 6,500 shares of ConAgra stock in the Schwab account were Tim's nonmarital property.

### (ii) Other Holdings in
### Schwab Account

Marital and nonmarital funds were withdrawn and deposited into the Schwab account. In order to purchase the parties' marital home, Tim wired funds directly from the Schwab account to the real estate company. The parties acquired several large sums of money from a settlement award, the mortgage on the marital home, and the proceeds from the sale of the former marital home. Some of the moneys were placed in the joint account, some were used for home improvements, and the remaining $240,000 was placed in the Schwab account.

Additionally, Tim diversified the account with both marital and nonmarital funds. The record shows that Tim sold thousands of ConAgra shares and purchased ETF's. The record further shows that as Tim moved marital funds into the Schwab account, he diversified those moneys into the same ETF's. He then sold some of the ETF's and purchased other ETF's.

---

[48] *Id.*

[49] *Id.*

Except for the 6,500 shares of remaining ConAgra stock, the evidence presented did not show that the gifted stock was segregated or traceable into its products. Several gifted shares and marital moneys were used to purchase ETF's. ETF's were then sold to purchase different ETF's. Clearly, the nonmarital property became commingled when it was inextricably mixed with the marital property through diversification. It was Tim's burden to show what portion of the parties' assets were attributable as nonmarital assets. Tim did not meet his burden. We conclude that the district court did not abuse its discretion when classifying the Schwab account, other than the 6,500 shares of ConAgra stock, as marital property.

The district court's decree valued the Schwab account at $1,432,796 and divided it equally between the parties, i.e., $716,398 to each party. Having modified the decree to classify the remaining 6,500 shares of ConAgra stock, which were valued at $232,440, as Tim's nonmarital property, we further modify the decree to divide the remaining value of the Schwab account, totaling $1,200,356, equally between the parties, i.e., $600,178 to each party. Thus, of the value of the Schwab account totaling $1,432,796, Tim shall receive $832,618 and Ann shall receive $600,178.

## 2. Valuation Date

[17] The next assignment of error falls within the second step of the three-step framework for division of property. The second step in the equitable division of property is to value the marital assets and marital liabilities of the parties.[50]

On cross-appeal, Ann argues that the district court erred in valuing the 6300 account and the Schwab account on June 30, 2017, instead of July 31, 2018. She contends that Tim received a windfall from the growth in the accounts between the two valuation dates. She contends that the district court considered the growth of the accounts when it ordered Tim to pay the tax liability. Ann does not explain why the June 30, 2017,

---

[50] See *Dooling v. Dooling, supra* note 5.

valuation date was not reasonably related to the property. She requests that if we change the district court's findings in any way, we should consider this growth.

[18] Ann's argument lacks merit. As a general principle, the date upon which a marital estate is valued should be rationally related to the property composing the marital estate.[51] She has failed to show how the June 30, 2017, valuation date does not reasonably relate to the property. And she has failed to identify why the July 31, 2018, valuation date reasonably relates to the property. The district court found that the June 30, 2017, valuation date was "best supported by the evidence and represents the separation of the parties['] working finances." Upon a de novo review of the record, we cannot say that the district court abused its discretion in determining the valuation date.

### 3. Division

[19,20] The remaining assignments of error fall within the third step in the process of dividing property. The third step in the equitable division of property is to calculate and divide the net marital estate between the parties in accordance with the principles contained in § 42-365.[52] The ultimate test in determining the appropriateness of the division of property is fairness and reasonableness as determined by the facts of each case.[53]

### (a) 2017 Tax Liability

Tim argues that the district court erred in allocating the parties' 2017 tax liability. He relies on *Meints v. Meints*[54] for the proposition that income tax liability incurred during the marriage is one of the accepted costs of producing marital income, and thus, income tax liability should generally be treated as a marital debt. He contends that *Meints* effectively holds that

---

[51] *Rohde v. Rohde, supra* note 46.

[52] See *Dooling v. Dooling, supra* note 5.

[53] *Id.*

[54] *Meints v. Meints*, 258 Neb. 1017, 608 N.W.2d 564 (2000).

one spouse cannot be solely responsible for the parties' tax liability. He contends that the district court did not equitably divide the marital debt. We disagree.

In *Meints*, during the course of the marriage, the husband accrued a federal income tax liability and statutory penalties for late filings.[55] The district court found that the husband was responsible for the accrued income tax liability. We reasoned that although income tax liability was a marital debt, when an innocent spouse has filed a separate tax return and paid his or her taxes in a timely manner, the innocent spouse should not be forced to share in the statutory penalties. We concluded that the district court erred in attributing all past due tax liability to the husband and that the tax liability should have been equitably divided, while the statutory penalties should remain as nonmarital debt of the husband.

While the *Meints* rule generally applies, the specific facts of this case support a different outcome. The record supports that the district court gave proper consideration to fairness and reasonableness when dividing the 2017 tax liability. The district court determined that because "the operative date of the appropriate determination of the value of the disputed marital assets is June 30, 2017 for both [the 6300 account and the Schwab account], [Tim] is ordered to pay the 2017 tax liability." The record showed that if Ann's federal and state income tax withholdings were insufficient to cover the entirety of the parties' tax liability, Tim would pay the tax liability from the Schwab account. It showed that Ann earned a salary of over $200,000 a year and that she had significant federal and state income withholdings. Additionally, there was evidence of significant growth in both the 6300 account and the Schwab account between the argued for valuation dates, which would effectively be awarded to Tim. Based upon the facts of the case, it appears that the district court considered fairness and reasonableness as to the parties' circumstances

---

[55] *Id.*

when distributing the tax liability. We cannot say that the district court abused its discretion when ordering Tim to pay the 2017 tax liability.

### (b) Equalization

Based upon all his arguments, Tim argues that it was inequitable for the district court to order an equalization payment. He contends that if we were to remove the appreciation on the 6300 account and the entirety of the Schwab account from the marital estate, 56 percent of the estate would accrue to Ann and only 44 percent to him. The circumstances, he suggests, do not justify a disparate division of the marital estate.

But we have rejected the conditions on which his argument is premised. We do not remove the appreciation on the 6300 account and the entirety of the Schwab account from the marital estate. Thus, his argument necessarily fails. And because we have already accounted for the removal of the 6,500 ConAgra shares and the equal division of the remainder of the value of the Schwab account above, no further modification is necessary here.

### VI. CONCLUSION

After reviewing the record de novo, we conclude that the district court did abuse its discretion when it found that the remaining 6,500 shares of ConAgra stock in the Schwab account were marital property. We otherwise conclude that the district court did not abuse its discretion in classifying, valuing, and dividing the remaining marital estate. We modify the decree to classify the remaining 6,500 shares of ConAgra stock, which were valued at $232,440, as Tim's nonmarital property, and to divide the remaining value of the Schwab account, totaling $1,200,356, equally between the parties, i.e., $600,178 to each party. As so modified, we affirm the decree of the district court.

Affirmed as modified.

Heavican, C.J., participating on briefs.